# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

JILL COSHLAND

      Plaintiff,

v.

BRETT BOLTON

      Defendant.

Case No. 3:26-cv-00291_____

## COMPLAINT

Plaintiff Jill Coshland ("Ms. Coshland" or "Plaintiff"), by her undersigned counsel, hereby alleges and avers as follows:

## STATEMENT OF THE CASE

1. Plaintiff Jill Coshland is a North Carolina resident who had partnered with her fiancé Felix Sabates ("Mr. Sabates") and friend Dragana Dujovic ("Ms. Dujovic") to launch a business in North Carolina called "Fashions by Dragana" that would sell purses, belts, scarves and other apparel.

2. The three partners behind Fashion by Dragana, including Ms. Coshland, had created a business plan, agreed on a name, met with accountants, an investment banker and a lawyer to discuss corporate formation and tax treatment, held meetings with consultants who had industry connections, and secured financing for the business.

3. Then, beginning on May 5, 2023, without provocation or basis, Defendant Brett Bolton ("Bolton" or "Defendant") set about to destroy Ms. Coshland's business prospects through harassment, personal denigration, and flagrant falsehoods.

4.     Bolton, apparently consumed with misplaced jealousy, targeted Mr. Sabates with vulgar, hateful, and abusive messages, first via phone call and then through a barrage of vulgar text messages, threatening to impugn Mr. Sabates, destroy his career, physically harm him, and even trigger a medical episode that could threaten Mr. Sabates' life.

5.     Ms. Coshland was with Mr. Sabates at the time the phone call was placed and the messages were sent, and was even targeted in many of them.  Bolton called Ms. Coshland a "whore" in the messages no fewer than four times, repeatedly referenced her in connection with disgusting sexual insults, and made clear that he would block Ms. Dujovic from contacting Ms. Coshland and continuing to proceed with the business.

6.     Bolton threatened to throw Ms. Dujovic and their children out of the house with no spousal support if she continued speaking and working with Ms. Coshland and Mr. Sabates.

7.     Bolton's vicious conduct was aimed at Ms. Coshland and Mr. Sabates while they were present in North Carolina, where each has deep ties.

8.     Bolton's intent was to destroy this fledging business and ensure that Ms. Coshland and Mr. Sabates could not freely associate professionally with Ms. Dujovic, as was their wish and right under freedom of association and freedom of contract.

9.     Unfortunately, Bolton's gambit worked and Fashions by Dragana collapsed before it could be launched as a direct result of Bolton's sustained campaign of abuse and threats aimed at Ms. Coshland and Mr. Sabates.

10.     Bolton has a history of mental difficulty with multiple episodes of threatening harm to himself and those around him.  Ms. Coshland and Mr. Sabates were accordingly quite frightened, anxious, and distraught in the aftermath of his tirade and threats.

2

11. Ms. Coshland, who put sweat equity into the business, lost her opportunity at a new career path, lost the promised income that she would have received from the company in compensation, and lost the opportunity for significant profits as a one-third owner of Fashions by Dragana, had it launched.

## PARTIES

12. Plaintiff Jill Coshland is a resident of Charlotte, North Carolina.

13. Upon information and belief, Defendant Bret Bolton is a resident of Florida.

14. Bolton is a hair transplant doctor currently licensed to practice medicine in Florida and formerly licensed in Ohio, Tennessee, Michigan and Ohio.

## JURISDICTION

15. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (a) there is complete diversity of citizenship among the parties; and (b) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16. Defendant committed an intentional tort directed at a resident of North Carolina, intended for the harm caused by those intentional acts to be felt in North Carolina, and expressly aimed his tortious conduct at North Carolina.

17. Defendant knew, at all relevant times, that Plaintiff was a North Carolina resident that intended to launch Fashions by Dragana in North Carolina and interact with customers, vendors and suppliers located in and/or doing business in North Carolina.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to these claims occurred in this District.

3

## FACTUAL BACKGROUND

### A.    Fashions by Dragana

19.    Ms. Coshland is in a long-term romantic relationship with non-party Felix Sabates.

20.    Mr. Sabates is a pillar of the Charlotte business and philanthropic community and has been instrumental in donating time, money and effort to various charities and medical institutions, including the Atrium Health Sanger Clinic, the Imaging Center and the Thoracic Surgery Center located in Charlotte.  Among other things, Mr. Sabates was a minority owner of the Charlotte Hornets for over 30 years, majority owner of the Charlotte Checkers, the CEO and majority shareholder of TSC Group, which represented companies such as Atari, Nintendo, Canon Copiers, and Compaq Computers, team owner of a NASCAR team for over 30 years, and owner Sabates Automotive Group, a chain of car dealerships across North Carolina.

21.    In or around 2022, Mr. Sabates decided to pursue a business opportunity with non-party Dragana Dujovic, who manufactured consumer goods such as purses, belts and scarves.

22.    The business was set to be called "Fashions by Dragana" and be co-owned in equal one-third shares by Ms. Coshland, Mr. Sabates, and Ms. Dujovic.

23.    Ms. Dujovic was set to be the creative engine of the company, Mr. Sabates to provide the capital, and Ms. Coshland to handle day-to-day operations and support Ms. Dujovic.

24.    In late 2022, Ms. Coshland and Mr. Sabates approached Rene Usher ("Ms. Usher"), the founder of Dragonfly Capital, a North Carolina-based investment banking firm, and discussed a potential investment with Ms. Usher.

25.    Ms. Usher did not invest in Fashions by Dragana at the time, but told Ms. Coshland and Mr. Sabates that she would revisit the financing plan after Fashions by Dragana was fully set up.

4

26. In or February 2023, Ms. Dujovic travelled to Charlotte, North Carolina for business meetings with Ms. Coshland and others related to the fledging business.

27. One of those meetings was with an accounting firm located in Charlotte to discuss entity formation and tax treatment.

28. Mr. Sabates also spoke with a lawyer who provided advice on business formation, intellectual property, and formation documents.

29. During the same period while Ms. Dujovic was in North Carolina in February 2023, Ms. Coshland, Mr. Sabates, and Ms. Dujovic participated in a meeting with Mr. Sabates's brother, Arturo Sabates, who has significant distribution contacts, including with several well-known national chains expected to be interested in the Company's products once launched.

30. As a result of the February 2023 meetings in Charlotte, Ms. Coshland, Mr. Sabates and Ms. Dujovic collectively decided Fashions by Dragana would be a North Carolina limited liability company that elected S-corporation status for tax purposes.

31. Shortly after the February 2023 meetings, Mr. Sabates wired $5,000 to Ms. Dujovic to procure samples and other materials, create marketing materials and arrange a photo shoot.

32. Between October 2022 and April 2023, Mr. Sabates supplied over $28,000 in capital to cover other preparatory steps to ready the business for launch later in 2023, including arrangement of advertisements and other marketing.

33. By the end of April 2023, Ms. Dujovic began creating the product line for Fashions by Dragana, ordered samples, arranged for advertising and marketing campaigns and began planning a trip to Asia with Ms. Coshland to obtain samples, meet with manufacturers and further the business.

5

34.     As part of her anticipated role with the company, Ms. Coshland expected to receive a salary of approximately $60,000 annually and participate in its profits matching her one-third interest in its equity.

**B.     Bolton's Connection to the Plaintiff.**

35.     Bolton is the father to Ms. Dujovic's three children and, around the time of relevant events described herein, was involved in a romantic relationship with Ms. Dujovic. The two were never married.

36.     Through Ms. Dujovic, Bolton knew Ms. Coshland and Mr. Sabates socially.

37.     Ms. Coshland and Mr. Sabates had numerous social outings with Ms. Dujovic and Bolton.

38.     Bolton was aware of Ms. Dujovic's talent for producing purses and other apparel, as well as her interest in expanding her then-small operation into a business with Ms. Coshland's and Mr. Sabates' assistance.

39.     In early 2023, contemporaneously with the events described above, Bolton was aware that Ms. Dujovic intended to go into business with Ms. Coshland and Mr. Sabates. He was further aware that numerous steps were taken in furtherance of that intention to launch the business, including Ms. Dujovic's trips to Charlotte to discuss the business and set up the business structure.

40.     In particular, Bolton attended a dinner in April 2023 with, among others, Ms. Coshland and Mr. Sabates, in which the business plan and intended launch of Fashions by Dragana was discussed. During the dinner, Bolton stated that he had no desire to be involved in the business in any context, including as an investor.

41.     Bolton has a history of mental illness, including episodes that threaten harm to himself and those around him.

6

42. Bolton was suspended from medical practice in Tennessee in 2014 following an incident in New York in which he allegedly assaulted a stranger and was admitted to a psychiatric ward at a New York hospital for evaluation.[1]

43. Bolton previously had his medical license suspended in Ohio through a permanent revocation order after a federal court conviction in 2003.[2]

### C.   Bolton's Intentional Interference and Infliction of Emotional Distress in an Attempt to Destroy Fashions by Dragana.

44. At some point in early to mid-2023, Bolton started to believe that Mr. Sabates was having an affair with Ms. Dujovic. This was not accurate, as Mr. Sabates and Ms. Dujovic maintained only a friendship and business relationship.

45. On the evening of Friday May 5, 2023, Mr. Sabates received a phone call from Ms. Dujovic's phone number. The caller was Bolton, not Ms. Dujovic.

46. On the call, Bolton threatened to physically harm Mr. Sabates, including that Bolton would "kill" Sabates if he continued to have a business relationship with Ms. Dujovic. Bolton also accused Mr. Sabates of being intimate with Ms. Dujovic, accused Mr. Sabates of giving a venereal disease to Ms. Dujovic, and alleged without basis that Mr. Sabates was paying Dujovic specifically for that purpose.

47. Ms. Dujovic was in the same room as Bolton at the time of the phone call and witnessed Bolton make these threats while using her phone.

48. Mr. Sabates hung up the phone and immediately relayed the contents of the conversation to Ms. Coshland, who was with Mr. Sabates at the time of the call in Charlotte.

---

[1] https://www.dailymail.co.uk/news/article-2852464/Hair-transplant-doctor-stars-loses-medical-license-declaring-reincarnation-Jesus-Christ.html; https://www.williamsonscene.com/brentwood/news/state-suspends-medical-license-of-mentally-ill-brentwood-hair-transplant-surgeon/article_3063909d-13ef-5b5e-a30b-cd029b553073.html.
[2] https://elicense.ohio.gov/oh_verifylicensedetails?pid=a0Rt0000000c08xEAA.

49.     Both Ms. Coshland and Mr. Sabates were horrified by the threats and, understanding Bolton's history of erratic behavior, felt genuine fear, distress and anxiety for their physical safety, as well as concern for their friend whose partner was acting erratically.

50.     Shortly after the phone call, Bolton began sending vulgar and abusive text messages from his personal cell phone line to Mr. Sabates' personal phone.

51.     The episode included over 300 text messages over two days containing vile, threatening, and defamatory statements impugning Ms. Coshland and frequently invoking her in Bolton's invective against Mr. Sabates.

52.     During this tirade of text messages, Bolton called Ms. Coshland a "whore" at least four times.

53.     During this tirade of text messages, Bolton repeatedly referred to her knowledge of Mr. Sabates' supposed sexual proclivities, making particular threats that he would expose supposedly damaging information about Mr. Sabates to Ms. Coshland.

54.     During this tirade of text messages, Bolton repeatedly threatened to publicize the messages about and involving Ms. Coshland.

55.     Those messages are particularly vile and abusive.  Among other things, Bolton wrote that Sabates (i) was having an affair with Ms. Dujovic in which he was paying her in exchange for sex: (ii) engaged in other affairs; (iii) had a venereal disease that he gave to Ms. Dujovic; (iv) participated in group anal sex with twelve men with others watching; (v) regularly performed explicit sexual acts with and in front of Bolton; and (vi) suffered from Alzheimer's.

56.     Bolton sent these text messages with full knowledge that the statements were false and with malicious intent to inflict economic, reputational, and emotional harm on Ms. Coshland and Mr. Sabates.

57. While simultaneously sending messages to Mr. Sabates, Bolton sent messages to Mr. Sabates and Ms. Dujovic in a group chat whereby Bolton explicitly instructed Mr. Sabates to "Stay the fuck away from my wife, douche bag" and demanded that Mr. Sabates and Ms. Dujovic confirm the end of their business relationship.

58. As with the phone call, Ms. Coshland felt significant distress, anxiety and shame after Bolton's text messages. She, as did Mr. Sabates, feared for physical safety if and when they next saw Bolton, and were concerned that Bolton would attempt to create a messy public incident as retribution against Ms. Coshland and Mr. Sabates.

59. Bolton appeared to be preparing to selectively release the messages, writing "all of these messages are being copied on multiple platforms, so they will always be saved so that way nobody can ever delete all of our sexy messages together"; "I will put all of the Text Messages that we have throughout our entire relationship to the news so everyone can see the true relationship we have"; and "I certainly hope the news media doesn't learn about our secret affair...I will do my best to keep your secrets."

60. Ms. Coshland could only interpret these statements as threats that Bolton would try to selectively publish them to embarrass or impugn Ms. Coshland, as Bolton's demeanor suggested both a reckless disregard of reality and an attempt to "create a record" that could be useful in his personal attacks against her and Mr. Sabates.

61. Ms. Coshland felt further acute angst for the health of her fiancé. Mr. Sabates suffered from a heart condition that can be suddenly and significantly worsened through stress and physical or mental distress.

62. Bolton was aware of Mr. Sabates' heart condition and expressly referenced it in the text messages, writing: "I wouldn't be surprised if you had a heart attack tonight due to all the

excitement…"; "I can't wait for you to die of natural causes from your cardiac disease. You will probably die within the next six months from your cardiac disease of natural causes"; and "Remember, opens you soon die die [sic] of natural causes, due to severe cardiac disease, I will be first to come and take a nice piss, diarrhea, and shit on your grave!!!!" These messages strongly suggest that Bolton wanted to trigger a cardiac episode or other health event.

63. In the wake of this incident, Mr. Sabates' incidences of arrythmia have increased and the frequency with which he needs treatment has increased since May 2023.

64. Upon information and belief, Bolton continued to disparage Ms. Coshland through May and June 2023, repeating his vulgar statements to numerous individuals in his social circle, many of whom know Ms. Coshland, in an effort to further threaten the future business prospects of Fashions by Dragana.

**D.      Bolton Succeeds in Sinking Fashions by Dragana.**

65. Bolton's attacks on Ms. Coshland and Mr. Sabates were successful in terminating the fledging business relationship between the two and Ms. Dujovic.

66. Bolton forced Ms. Dujovic to block Ms. Coshland and Mr. Sabates' numbers on her phone and prevented her from communicating with them, regardless of the subject matter, thereby effectively destroying the business.

67. Bolton threatened to throw Ms. Dujovic and their three children out of his house if she did not comply with his demands to block Ms. Coshland and Mr. Sabates' numbers and to refrain from contacting them in the future—threats that he ultimately acted upon shortly thereafter.

68. After the phone call and text messages, Ms. Coshland and Mr. Sabates both came to the conclusion that being in business with Ms. Dujovic was not feasible given Bolton's behavior and his targeted threats. They were, reasonably, in fear that Bolton would continue to harass and threaten both of them if they continued with the business.

69. Around the same time, Bolton also took from Ms. Dujovic samples, inventory and business materials, making it impossible for her to continue advancing the anticipated product line.

70. Ms. Sabates did not provide any further capital, and neither Ms. Coshland nor Mr. Sabates took any further steps to launch Fashions by Dragana.

71. Shortly before Ms. Coshland and Mr. Sabates received the call and text messages from Bolton, Ms. Usher, Ms. Coshland and Mr. Sabates discussed the progress of Fashions by Dragana. However, shortly after receiving the threatening messages from Bolton, Ms. Coshland and Mr. Sabates informed Ms. Usher that they had to terminate the business due to the unwarranted and threatening interference by Bolton.

**E.      Bolton Purposefully Directed His Tortious Activities at North Carolina**

72. At all relevant times, Ms. Coshland has been a citizen of the State of North Carolina and has maintained a North Carolina driver's license and address.

73. Ms. Coshland has long and well-established ties to the Charlotte community and North Carolina, including a multitude of charitable and public service endeavors. Bolton is aware of those North Carolina connections.

74. Ms. Coshland was with Mr. Sabates in Charlotte, North Carolina on the evening of May 5, 2023, when Mr. Sabates received Bolton's call and text messages.

75. Upon information and belief, Bolton was attempting to cause emotional distress to Ms. Coshland, as well as Mr. Sabates, while they were located in North Carolina, and hoped to trigger physical health complications to Mr. Sabates, which would have resulted in physical injuries within this State.

76. The fledging business Fashions by Dragana was going to be operated from Charlotte and be registered as a North Carolina limited liability company.

77. Ms. Dujovic, Ms. Coshland, and Mr. Sabates took meetings with accountants and other third parties who were going to be involved in the business in North Carolina, events of which Bolton was aware through his relationship with Ms. Dujovic.

78. A substantial portion of the harm resulting from Bolton's tortious actions has been felt in North Carolina, including the severe emotional distress suffered by Ms. Coshland in the immediate aftermath of May 5, 2023.

79. Bolton has significant jurisdictional contact within North Carolina, both related to this action and to his own business endeavors.

80. Bolton's clinic, Great Hair Transplants, advertises Bolton's services directly to North Carolina residents, specifically identifying services provided to dozens of localities in, for example, Mecklenburg and Gaston Counties.[3]

81. Bolton's YouTube channel posted a video titled "Natural Hair Transplant Clinic in Asheville, North Carolina – Dr. Brett Bolton."[4]

## FIRST CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations

82. Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

83. Ms. Coshland had a valid business expectancy with regard to her contemplated one-third equity interest in and anticipated employment with Fashions by Dragana. Ms. Coshland made an affirmative decision to go into business with Ms. Dujovic and Mr. Sabates.

84. In furtherance of that business relationship, the nascent company had undertaken significant preparatory activities, including meeting with accountants and other third parties,

---

[3] https://www.greathairtransplants.com/states/NC/Mecklenburg/ (last accessed Mar. 30, 2026); https://www.greathairtransplants.com/states/NC/Gaston/Gastonia/ (last accessed Mar. 30, 2026).
[4] https://www.youtube.com/watch?v=ZbuaXRmnJKM (last accessed Mar. 30, 2026).

sourcing sample materials for production, planning visits with suppliers, and communicating with consultants about placements of company products in national retail chains. Capital was also provided to Ms. Dujovic to obtain samples and secure marketing campaigns for the product launch.

85. Bolton tortiously interfered with Ms. Coshland's expected business arrangement with Ms. Dujovic and Mr. Sabates by, *inter alia*, harassing Mr. Sabates and making it unfeasible for either Ms. Coshland or Mr. Sabates to be involved in a business arrangement with Ms. Dujovic with Bolton's harassment and threats to their safety, forcing Ms. Dujovic to cease any contact with Ms. Coshland or Mr. Sabates, and seizing samples and inventory from Ms. Dujovic.

86. Bolton, who is a co-parent to Ms. Dujovic's children, made clear that any ongoing business relationship with Ms. Dujovic would produce further harassment and resistance from Bolton and would cause harm to Ms. Dujovic's living situation and jeopardize housing for her children.

87. Bolton's interference was intentional and unprivileged. He desired to submarine Ms. Dujovic's business out of personal animus for Mr. Sabates and Ms. Coshland.

88. Bolton acted with malice and revenge, and for purposes not reasonably related to legitimate business interests.

89. Bolton is not involved in the fashion industry and could not have fairly competed with Fashions by Dragana.

90. Absent Bolton's interference, Fashions by Dragan would be operating at this time.

91. Ms. Coshland has been monetarily damaged by Bolton's intentional interference in the form of lost salary and profits from the Fashion by Dragana entity that would have launched but for Bolton's conduct.

92. An independent analysis of the equity value of Fashions by Dragana had it launched estimated the enterprise value of Fashions of Dragana as of March 1, 2023, to be between $2.0 million and $11 million, to which Ms. Coshland would have been entitled to one third (33.3%).

93. Ms. Coshland thus seeks monetary damages based on her one-third equity interest and lost salary.

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

94. Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

95. Bolton made the May 5 phone call and sent the text messages while Ms. Coshland was with Mr. Sabates and with the intent that she would be exposed to their content. This is illustrated by the repeated references to Ms. Coshland in the text messages.

96. The statements made by Bolton in the phone call and text messages, which included emotional abuse, harassment, and unambiguous threats, were extreme and outrageous, clearly exceeding the bounds of civilized society.

97. Bolton acted with intent to cause emotional harm and extreme recklessness that showed a blatant disregard for the impact his conduct would have on Ms. Coshland.

98. Because Ms. Coshland and Mr. Sabates had and have a close relationship as fiancées and long-time partners, it was foreseeable and, indeed, inevitable that Bolton's campaign of harassment and abuse against Mr. Sabates would result in emotional distress to Ms. Coshland.

99. Bolton was acutely aware of Mr. Sabates' heart condition and potential impact of external stressors such as Bolton's campaign of harassment and wished expressly in the messages for Mr. Sabates to suffer medical complications, an outcome Bolton knew would cause severe distress to Ms. Coshland.

100. Ms. Coshland suffered severe emotional distress, including fear and anxiety that Bolton (who has a history of mental instability) would continue to harass, threaten, and/or emotionally and physically harm Mr. Sabates. She also felt and continues to feel apprehension that Bolton will target her with similar vulgar and abusive harassment or attempt to defame her in the public sphere.

### THIRD CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**

101. Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

102. Bolton failed to take reasonable care when making the statements in the phone call and sending text messages to Mr. Sabates. The messages were full of abusive, harassing and threatening language that exceeded the bounds of civilized society.

103. Bolton made the phone call and sent the text messages to Sabates while Ms. Coshland was with Mr. Sabates and with the intent that she would be exposed to their content as well. This is illustrated by the repeated references to Ms. Coshland in the text messages.

104. Ms. Coshland was in the zone of danger, as the negligent conduct of Bolton put her at risk of physical and emotional harm from his conduct.

105. Because Ms. Coshland and Ms. Sabates had and have a close relationship as fiancées and long-time partners, it was foreseeable that Bolton's campaign of harassment and abuse against Mr. Sabates would result in emotional distress to Ms. Coshland, particularly in light of Bolton's knowledge of Mr. Sabates' heart condition and potential impact of external stressors such as Bolton's campaign of harassment.

106. Ms. Coshland suffered from severe emotional distress, including fear and anxiety that Bolton (who has a history of mental instability) would continue to harass, threaten, and/or

emotionally and physically abuse Mr. Sabates.  She also felt and continues to feel apprehension that Bolton will target her with similar vulgar and abusive harassment or attempt to defame her in the public sphere.

## **PRAYER FOR RELIEF**

NOW THEREFORE, Plaintiff Jill Coshland prays for judgment in its favor and specifically for the following relief:

a)  Monetary damages to be determined at trial;

b)  Punitive damages pursuant to Count I and Count II; and

c)  Any other such relief that the Court deems proper.

## **JURY DEMAND**

Plaintiff Jill Coshland demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

This 15th day of April, 2026.

**AKERMAN LLP**

By:    */s/ Samuel G. Mann*
        Samuel G. Mann (NCSB No. 58643)
        samuel.mann@akerman.com
        101 South Tryon Street, Suite 1910
        Charlotte, NC 28280
        Tel: (704) 625-7700
        Fax: (704) 625-0300

        Christopher Carver (NCSB No. 32391)
        Jonathan Robbins (*pro hac vice forthcoming*)
        christopher.carver@akerman.com
        jonathan.robbins@akerman.com
        201 East Las Olas Boulevard, Suite 1800
        Ft. Lauderdale, FL 33301
        Tel: (954) 331-4120
        Fax: (954) 847-5309

        *Attorneys for Plaintiff Jill Coshland*